ORAL ARGUMENT NOT YET SCHEDULED
No. 24-1820

# In the United States Court of Appeals for the Third Circuit

BRISTOL MYERS SQUIBB COMPANY, ET AL.,

*Plaintiffs-Appellants,*

*v.*

XAVIER BECERRA, ET AL.,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of New Jersey

## BRIEF *AMICUS CURIAE* OF THE NEW CIVIL LIBERTIES ALLIANCE IN SUPPORT OF PLAINTIFFS-APPELLANTS AND REVERSAL

Andrew J. Morris
*Counsel of Record*
NEW CIVIL LIBERTIES ALLIANCE
1225 19TH ST. NW, SUITE 450
Washington, DC 20036
(202) 869-5210
andrew.morris@ncla.legal
*Counsel for* Amicus Curiae

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and L.A.R. 29(a)(4)(A), the undersigned counsel certifies that *amicus curiae* the New Civil Liberties Alliance is a nonprofit organization under the laws of the District of Columbia.  It has no parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

The undersigned further certifies that no counsel for a party authored this brief in whole or in part; and that no person or entity, other than NCLA and its counsel, made a monetary contribution intended to fund the preparation and submission of this brief.  *See* L.A.R. 29(a)(4)(E).

/s/ *Andrew J. Morris*
Andrew J. Morris

**STATEMENT REGARDING CONSENT TO FILE AND BAR MEMBERSHIP**

Pursuant to Fed. R. App. P. 29(a)(2), the undersigned represents that all parties have consented to the filing of this brief.  The undersigned further represents, pursuant to L.A.R. 28.3(d) and 46.1(e), that he has been admitted to practice before the United States Court of Appeals for the Third Circuit.

/s/ *Andrew J. Morris*
Andrew J. Morris

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................... i

STATEMENT REGARDING CONSENT TO FILE AND BAR
MEMBERSHIP ................................................................ ii

TABLE OF CONTENTS ....................................................... iii

TABLE OF AUTHORITIES ..................................................... iv

INTEREST OF AMICUS CURIAE ................................................ 1

STATEMENT OF THE CASE .................................................... 2

ARGUMENT ................................................................. 5

   I. ANATOMY OF AN UNCONSTITUTIONAL CONDITION ............................. 7

      A.  Unconstitutional Conditions:  A List of Elements ............... 8

      B.  Unconstitutional Conditions:  An Exploration ...................10

         1.  The Basic Unconstitutional Conditions Cases...............10

         2.  The Spending Clause Cases .................................15

   II. THE PROGRAM'S UNCONSTITUTIONAL CONDITION .........................21

      A.  The Condition .................................................22

         1.  Failure to Negotiate .....................................23

         2.  Failure to Sell at the "Negotiated" Price ...............26

      B.  The Constitutional Right.......................................27

      C.  The Spending Clause ..........................................33

CONCLUSION............................................................... 1

CERTIFICATE OF SERVICE .................................................. 3

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
  570 U.S. 205 (2013) .................................................... 15, 16, 17, 18, 33

*AstraZeneca Pharms. LP v. Becerra*,
  No. CV 23-931-CFC, 2024 WL 895036 (D. Del. Mar. 1, 2024) ............ 3

*Bristol Myers Squibb Co. v. Becerra*,
  No. 23-3335, 2024 WL 1855054 (D.N.J. Apr. 29, 2024) .................. 4, 29

*Cedar Point Nursery v. Hassid*,
  594 U.S. 139 (2021) ................................................................. 33

*Frost v. R.R. Comm'n of Cal.*,
  271 U.S. 583 (1926) ...................................................... 8, 10, 11, 12, 15

*Harman v. Forssenius*,
  380 U.S. 528 (1965) ........................................................ 7, 15, 23

*Horne v. Dep't of Agric.*,
  576 U.S. 350 (2015) ..................................................... 13, 14, 21, 28

*Kelo v. City of New London*,
  545 U.S. 469 (2005) ................................................................. 28

*Koontz v. St. Johns River Water Mgmt. Dist.*,
  570 U.S. 595 (2013) ................................................................. 9

*Milewski v. Town of Dover*,
  2017 WI 79, 377 Wis. 2d 38 ..................................................... 9

*Murdock v. Pennsylvania*,
  319 U.S. 105 (1943) ........................................................... 15, 23

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
  567 U.S. 519 (2012) ........................................................ 18, 19, 20

*Perry v. Sindermann*,
  408 U.S. 593 (1972) ............................................................. 7, 15

*Rutan v. Republican Party of Illinois*,
  497 U.S. 62 (1990) ................................................................. 15

*Sheetz v. Cnty. of El Dorado*,
 601 U.S. 267 (2024) .................................................................... 5

*Simmons v. United States*,
 390 U.S. 377 (1968) ................................................................9, 15

*Speiser v. Randall*,
 357 U.S. 513 (1958) ....................................................................15

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*,
 535 U.S. 302 (2002) ....................................................................28

## Constitutional Provisions

U.S. Const. amend. V....................................................................27

## Statutes

26 U.S.C. § 5000D .................................................. 3, 4, 23, 24, 25

42 U.S.C. § 1320f...................................................................2, 3

42 U.S.C. § 1320f-1 ................................................................. 2

42 U.S.C. § 1320f-3 ................................................................. 2

42 U.S.C. § 1320f-6(a) ...............................................................26

Inflation Reduction Act,
 Pub. L. No. 117-169, § 11003(b), 136 Stat. 1818 (2022) .....................26

## Other Authorities

Dep't of Health and Hum. Servs.,
 Ctrs. for Medicare & Medicaid Servs.,
 *Draft Guidance on the Medicare Drug Price Negotiation Program*
 (May 3, 2024) .....................................................................32

Philip Hamburger,
 *Purchasing Submission* (2021) ......................................................... 6

## INTEREST OF AMICUS CURIAE

The New Civil Liberties Alliance ("NCLA") is a nonpartisan, nonprofit civil-rights organization devoted to defending constitutional freedoms from the administrative state's depredations. Professor Philip Hamburger founded NCLA to challenge multiple constitutional defects in the modern administrative state through original litigation, *amicus curiae* briefs, and other advocacy.

The "civil liberties" of the organization's name include rights at least as old as the U.S. Constitution itself: jury trials, due process of law, and the right to live under laws made by the nation's elected legislators through constitutionally prescribed channels (*i.e.*, the right to self-government). These selfsame civil rights are also very contemporary— and in dire need of vindication—precisely because Congress, executive branch officials, administrative agencies, and even some courts have neglected them for so long.

NCLA aims to defend civil liberties—primarily by asserting constitutional constraints on the modern administrative state. Although Americans still enjoy the shell of their Republic, a very different sort of government has developed within it—a type that the Constitution was

1

designed to prevent. Here, NCLA is interested in the operation of the "unconstitutional conditions" doctrine, which prevents Congress from indirectly accomplishing what the Constitution forbids it from doing directly. Our purpose as *amicus* is to emphasize the importance of preserving constitutional rights against attempts to subvert them through what the Supreme Court of the United States calls "extortion."

## STATEMENT OF THE CASE

Dissatisfied with how much it has been spending on medications covered by Medicare, Congress included in the Inflation Reduction Act of 2022 (IRA) a mandate for the Secretary of Health and Human Services[1] to "establish a Drug Price Negotiation Program" (the Program). 42 U.S.C. § 1320f *et seq.* After identifying the medications comprising the greatest total expense to Medicare (the Selected Drugs), the Program directs HHS to negotiate a sub-market price at which consumers covered by Medicare may access them. 42 U.S.C. §§ 1320f-1, 1320f-3. To achieve this cost reduction, the IRA clothes HHS with two personae: (1) A

---

[1] This brief will refer to the appellees collectively as "HHS."

market-dominating participant in negotiations with manufacturers of the Selected Drugs, and (2) a government actor with the power to impose sanctions on manufacturers who do not come to terms.

HHS enjoys significant negotiating power simply by virtue of its market participation.[2]  So when the IRA says pharmaceutical companies must "negotiate … maximum fair prices for such selected drugs," 42 U.S.C. § 1320f, HHS enters the process in a market-dominating position.

But HHS does not rely solely on its power as a market participant when "negotiating" prices.  It also brings to bear something no private actor has—the power to sanction its negotiating counterparty for not coming to terms.  If a manufacturer does not enter into an Agreement to accept the "negotiated" price for the Selected Drugs from customers covered by Medicare, the IRA imposes a tax that ranges from approximately 186% to 1,900% of the manufacturer's gross daily sales of the Selected Drugs.  26 U.S.C. § 5000D.  If the manufacturer *does* execute an Agreement but nonetheless insists on charging market value for the

---

[2] The district court in *AstraZeneca Pharms. LP v. Becerra*, No. CV 23-931-CFC, 2024 WL 895036 (D. Del. Mar. 1, 2024), helpfully described the extent of this power.

Selected Drugs, the IRA imposes a penalty in an amount equal to 10 times the difference between the "negotiated" price and the actual sales price of the Selected Drugs.   42 U.S.C. § 1320f-6(a). The only way a manufacturer can avoid these taxes and penalties, without surrendering its Fifth Amendment rights, is to withdraw all its products from the Medicare market.   26 U.S.C. § 5000D(c).

The district court, in relevant part, concluded that because the manufacturers' decisions to sell their products in the Medicare market are voluntary, there can be no violation of the Fifth Amendment's Takings Clause. *Bristol Myers Squibb Co. v. Becerra*, No. 23-3335, 2024 WL 1855054, slip op. at 18 (D.N.J. Apr. 29, 2024).   It also concluded the Program contains no unconstitutional condition because the Program causes no "physical taking in violation of the Fifth Amendment," a conclusion based almost entirely on its flawed voluntariness analysis. *Id.* at 25–26.

4

## ARGUMENT

The IRA does not send HHS forth merely as a market participant to engage in arm's-length contract negotiations with pharmaceutical companies for purchase of the Selected Drugs. Nor does it simply announce the maximum price the government is willing to pay for the medications it wants to purchase. Instead, it appears Congress modeled the Program on the brutish dynamics common to clichéd mafia movies: "Nice business you got there; shame if anything were to happen to it."

The Program departs from the genre in at least one respect, though—whereas the stereotypical mob enforcer leaves the threats veiled, Congress makes them explicit: Accept sub-market payments for the Selected Drugs or the government will either ban all of your products from the Medicare market, or destroy the economic value of the Selected Drugs (and maybe even the rest of your business). As the United States Supreme Court confirmed just a few months ago, the proper term for this type of behavior is not negotiation, but—and this is the word the *Court* chose—"extortion." *Sheetz v. Cnty. of El Dorado*, 601 U.S. 267, 275 (2024).

It may be politically popular to curtail the constitutional rights of mega-companies that lay golden eggs, but if Congress can do this to the

pharmaceutical companies, then it can do it to mom-and-pop businesses, too. Americans deserve better than a Congress that engages in extortionate behavior. More importantly, they have a *right* to be free from such quintessentially underworld conduct.

The "unconstitutional conditions" doctrine is the framework for vindicating that right. Broadly speaking, it forbids the government from making participation in an otherwise lawful activity contingent on the surrender of a constitutionally-protected right. In this case, the Program makes it impossible, as a practical matter, for the manufacturers to sell the Selected Drugs without "consenting" to the surrender of rights protected by the Takings Clause. But as Professor Philip Hamburger explains, that consent can be illusory: "Even amid consent, conditions can come with the force of law or other constitutionally significant pressure—sometimes in the inducement and sometimes in enforcement. Accordingly, many conditions that restrict constitutional rights should be considered unlawful and void."[3] Because the unconstitutional conditions

---

[3] Philip Hamburger, *Purchasing Submission* 211 (2021).

doctrine forbids Congress from subverting the plaintiffs' constitutional rights in this manner, the district court must be reversed.

## I.    ANATOMY OF AN UNCONSTITUTIONAL CONDITION

Constitutional rights are not annoyances to be evaded through sophisticated indirection and manipulation.  They are to be honored frankly and in full, because they "would be of little value if they could be indirectly denied or manipulated out of existence."  *Harman v. Forssenius*, 380 U.S. 528, 540 (1965) (cleaned up).  By now, it should be a given that the Constitution "nullifies sophisticated as well as simple-minded modes of impairing the right[s] [it] guarantee[s]."  *Id*. at 540–41 (internal quotations omitted).  That axiom is essential, "[f]or if the government could deny a benefit to a person because" he insists on his constitutional rights, "his exercise of those freedoms would in effect be penalized and inhibited." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). This, in turn, "would allow the government to produce a result which it could not command directly."  *Id*. (cleaned up).  Almost 100 years ago, the Supreme Court condemned this practice in no small part because it knew that condoning such machinations endangers *all* constitutional rights: "If the state may compel the surrender of one constitutional right as a

condition of its favor, it may, in like manner, compel a surrender of all. It is inconceivable that guaranties embedded in the Constitution of the United States may thus be manipulated out of existence." *Frost v. R.R. Comm'n of Cal.*, 271 U.S. 583, 594 (1926). Inconceivable, indeed.

Nonetheless, both the district court and the government failed to recognize the unconstitutional condition that lies at the heart of the Program, the mechanism without which the Congressional goal of making the Selected Drugs available to Medicare customers at less than market value would be impossible. Therefore, to assist in the ready recognition of such devices, this section of the brief provides an anatomy of an unconstitutional condition, as well as a review of some of the leading cases that illustrate how the mechanism is used to subvert constitutionally-protected rights.

### A.   Unconstitutional Conditions:  A List of Elements

An unconstitutional condition comprises the following four elements: (1) The objective; (2) a constitutional right; (3) the desideratum; and (4) the condition.  A few notes about each of the elements before reviewing the cases.  The objective, as the name implies, is an essential component of the governmental program's goal.  It is what the

8

government wishes to accomplish with respect to a targeted entity, the benefit it derives from the operation of the unconstitutional condition. The constitutional right is a protection vouchsafed to the target that would be violated if the government attempted to achieve its objective directly.    And the desideratum is the bait.    It is something the government knows the target wants to do, or keep, or avoid.  It is rarely constitutionally-protected, [4] and is always something that can be described as voluntary in nature.[5]  Its function is to serve as the lever upon which the fourth element acts.  That element—the condition—is what makes it possible for the government to indirectly achieve what it

---

[4] For the rare circumstance in which the desideratum enjoys express constitutional protection, see *Simmons v. United States*, 390 U.S. 377 (1968) (striking an attempt to pit the Fifth Amendment's protection against self-incrimination against the Fourth Amendment's right to be free of unreasonable searches and seizures); *Milewski v. Town of Dover*, 2017 WI 79, 377 Wis. 2d 38 (striking an attempt to pit the right to challenge a property tax assessment (protected by Wisconsin's constitution) against the Fourth Amendment's right to be free of unreasonable searches and seizures).

[5] "Virtually all of our unconstitutional conditions cases involve a gratuitous governmental benefit of some kind.  … Yet we have repeatedly rejected the argument that if the government need not confer a benefit at all, it can withhold the benefit because someone refuses to give up constitutional rights." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 608 (2013).

could not do directly.  The condition is an exercise of governmental authority that either bars the target's access to the desideratum, or makes its enjoyment so counterproductive that the target will choose to surrender its constitutional right to avoid the condition's operation.  Each element is easily identifiable in the leading unconstitutional conditions cases, as discussed below.

### B.    Unconstitutional Conditions:  An Exploration

Dividing these cases into two groups will demonstrate there is no version of this doctrine under which the Program could be considered constitutionally sound.  The first group will illustrate the basics of the elements in operation.  The second group, a brace of Spending Clause cases, will clarify that, *pace* HHS's argument in the district court, the Spending Clause does not exempt the government from this doctrine.

### 1.    The Basic Unconstitutional Conditions Cases

One of the earlier cases featured California's goal of protecting common carriers from competition by private carriers.  *Frost,* 271 U.S. at 591 (1926).  To that end, it enacted a scheme that forbade any transportation company from using the State's roads without a permit issued by the Railroad Commission.  *Id*. at 592.  As relevant to this

10

analysis, the permit conditions imposed all the obligations and burdens of common carriers on private-carrier applicants. *Id*. Consequently, private carriers were faced with this choice: Either cease operating as a transportation company in California, or become, in essence, a common carrier.

Each of the elements is immediately apparent. The State's objective was to turn private carriers into common carriers to protect the latter from the former. It couldn't do this directly, however, because "consistently with the due process clause of the Fourteenth Amendment," the target "cannot be converted against his will into a common carrier by mere legislative command." *Id*. The target's desideratum, of course, was to operate on the State's roads as a private carrier. So, to accomplish indirectly what it could not do directly, the State imposed the condition: Access to the State's roads would be denied unless the target "voluntarily" relinquished its constitutionally-protected right not to become a common carrier.

In ruling that California could not indirectly achieve the objective by imposing the condition on Frost's desideratum, the Court offered the classic expression of how unconstitutional conditions operate. "It would

11

be a palpable incongruity," it said, "to strike down an act of state legislation which, by words of express divestment, seeks to strip the citizen of rights guaranteed by the federal Constitution, but to uphold an act by which the same result is accomplished under the guise of a surrender of a right in exchange for a valuable privilege which the state threatens otherwise to withhold." *Id*. at 593.

The "voluntary" surrender there truly was nothing but a guise. The Court did not miss the fact that the purpose of the condition was to use the desideratum as a means of coercing the target into forfeiting its constitutional right: "In reality, the carrier is given no choice, except a choice between the rock and the whirlpool—an option to forego a privilege which may be vital to his livelihood or submit to a requirement which may constitute an intolerable burden." *Id*. If this gambit were permissible, it said, then "constitutional guaranties, so carefully safeguarded against direct assault, are open to destruction by the indirect, but no less effective, process of requiring a surrender, which, *though in form voluntary*, in fact *lacks none of the elements of compulsion*." *Id*. (emphasis supplied). Hence, the Court held the condition unconstitutional.

A more recent case, *Horne v. Dep't of Agric.*, 576 U.S. 350 (2015), also usefully illustrates the elements of an unconstitutional condition.[6] There, a Department of Agriculture program required farmers who chose to grow grapes for raisin production to "physically set aside" a percentage of the farmer's crops "for the account of the Government, free of charge." *Id.* at 354. "The Government then sells, allocates, or otherwise disposes of the raisins in ways it determines are best suited to maintaining an orderly market." *Id.*

The elements follow the same pattern as *Frost*. The government's objective was to obtain the farmers' property free of charge for the purpose of stabilizing the raisin market. The farmers' desideratum, on the other hand, was to retain the property rights in their raisins. Because the objective describes what the Court said is a "classic taking," *id.* at 357, the Agriculture Department could not accomplish it directly. So, stymied by the constitutional right, it imposed the condition:

---

[6] In their district court briefs, the manufacturers cited *Horne* to correctly illustrate how the Program effects a physical, per se taking of the Selected Drugs. The purpose for addressing *Horne* here is to demonstrate the operation of the unconstitutional conditions doctrine in the Takings Clause context.

Farmers would be prohibited from making raisins unless they surrendered rights protected by the Takings Clause of the Fifth Amendment. The Court saw through the indirection and affirmed that constitutional rights cannot be so easily defeated. "The Government has broad powers," it said, "but the means it uses to achieve its ends must be 'consistent with the letter and spirit of the constitution.'" *Id.* at 362 (quoting *McCulloch v. Maryland*, 4 Wheat. 316, 421 (1819)).

It is worth noting that here, as in all unconstitutional conditions cases, the farmers' desideratum was voluntary thing. California asserted that the farmers didn't *have* to make raisins; they could have chosen to make wine instead, thereby avoiding the set-aside requirement. The Court dismissed this claim with no small amount of disdain: "'Let them sell wine' is probably not much more comforting to the raisin growers than similar retorts have been to others throughout history." *Id.* at 365. So, it held that "[s]elling produce in interstate commerce, although certainly subject to reasonable government regulation, is … not a special governmental benefit that the Government may hold hostage, to be ransomed by the waiver of constitutional protection." *Id.* at 366.

14

The elements of an unconstitutional condition function in the same manner wherever they appear. And where they exist, the Court declares their operation unconstitutional. *See, e.g., Frost*, 271 U.S. at 598 (collecting cases); *Murdock v. Pennsylvania*, 319 U.S. 105 (1943); *Speiser v. Randall*, 357 U.S. 513 (1958); *Harman*, 380 U.S. 528 (1965); *Simmons v. United States*, 390 U.S. 377 (1968); *Perry*, 408 U.S. at 596–97; *Rutan v. Republican Party of Illinois*, 497 U.S. 62 (1990).

### 2. The Spending Clause Cases

There is no Spending Clause exception to the unconstitutional conditions doctrine, *pace* HHS's suggestion in its district court briefing.[7] Indeed, it may be that the Supreme Court is even more sensitive to this gambit in Spending Clause cases than in others, as demonstrated by its opinion in *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013). There, the Court considered the Leadership Act, an effort to combat global HIV/AIDS by funding nongovernmental organizations (NGOs) involved in addressing that scourge. The program forbade any

---

[7] *See* Mem. of Law in Supp. of Defs.' Opp'n to Pl.'s Mot. for Summ. J. and Cross-Mot. at 37, ECF No. 38.

of the funds (with a few exceptions) from going to "any group or organization that does not have a policy explicitly opposing prostitution and sex trafficking … ." *Id.* at 210.  The Court interpreted this provision (the "Policy Requirement") as a mandate that fund recipients "explicitly agree with the Government's policy to oppose prostitution and sex trafficking," *id.* at 213, to which some NGOs objected on First Amendment grounds.

The unconstitutional condition elements followed the normal pattern.  The government's objective was to impose its views on the fund recipients as part of its effort to combat HIV/AIDS around the world.  It couldn't do that directly because, as the Court observed, "[w]ere it enacted as a direct regulation of speech, the Policy Requirement would plainly violate the First Amendment." *Id.*  The NGOs' desideratum was to access the funds so they could continue the global fight.  So, the Leadership Act leveraged the desideratum with this condition:  No funds without relinquishing First Amendment rights.

In concluding the condition was unconstitutional, the Court acknowledged that, as part of Congress' Spending Clause authority, it may "impose limits on the use of such funds to ensure they are used in

the manner Congress intends." *Id.* It also recognized that "if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds." *Id.* at 214. However, it is also true that "[i]n some cases, a funding condition can result in an unconstitutional burden" on constitutional rights. *Id.* (citing *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 59 (2006) (the First Amendment supplies "a limit on Congress' ability to place conditions on the receipt of funds")).

The Court explained that the line separating legitimate from unconstitutional funding conditions "is between conditions that define the limits of the government spending program—those that specify the activities Congress wants to subsidize—and conditions that seek to leverage funding to regulate" constitutional rights that are "outside the contours of the program itself." *Id.* at 214–15. In discerning that line, the Court was quick to say it wouldn't tolerate sophistry: "We have held, however, that 'Congress cannot recast a condition on funding as a mere definition of its program in every case, lest the First Amendment be reduced to a simple semantic exercise.'" *Id.* at 215 (quoting *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 547 (2001)). Perhaps it doesn't need to

17

be said, but the Court assuredly would not countenance the reduction of any other constitutional right to a "simple semantic exercise" either.

The dissent, in contrast, viewed the Policy Requirement as "nothing more than a means of selecting suitable agents to implement the Government's chosen strategy … ." *Id.* at 221 (Scalia, J., dissenting). That's not an inaccurate characterization of the requirement, and yet the majority still concluded the Policy Requirement was an unconstitutional condition. So, the Court appears to be at least as sensitive to indirect deprivations of constitutional rights through the exercise of the Spending Clause as in other contexts.

Congress' employment of the Spending Clause in *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012) (*NFIB*), also contained an unconstitutional condition. In the district court, HHS dismissed this as an inapposite federalism case, but a proper analysis reveals that the "federalism" aspect simply comprised the second element (the constitutional right) in the anatomy of an unconstitutional condition.

The Patient Protection and Affordable Care Act (the ACA), to the extent it is relevant here, expanded the Medicaid program by giving "funds to the States on the condition that they provide specified health

care to all citizens whose income falls below a certain threshold." *Id.* at 531. If a State failed to do so, "it may lose not only the federal funding for those requirements, but *all* of its federal Medicaid funds." *Id.* at 542 (emphasis supplied).

The unconstitutional condition elements are not difficult to identify. The ACA's objective, with respect to the Medicaid program, was to compel the States to expand the population of individuals eligible for coverage. This, however, is not something Congress could accomplish directly. The Court acknowledged that it has "long recognized that Congress may use this power [(the Spending Clause)] to grant federal funds to the States, and may condition such a grant upon the States' taking certain actions that Congress could not require them to take." *Id.* at 576 (cleaned up). But the power is not boundless, and "the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions." *Id.* at 577. This limitation prevented the ACA from achieving its objective directly because the Court invalidates "federal legislation that commandeers a State's legislative or administrative apparatus for federal purposes." *Id.* The anti-commandeering principle

the Court described was the second element of an unconstitutional condition (the constitutional right)—that is, the State's sovereignty within a federalist system.    So, the ACA leveraged the States' desideratum (continuation of federal Medicaid funding) by imposing this condition:  Release your right to legislate your own Medicaid policies, or lose all Medicaid funding whatsoever.  The Court declared the condition unconstitutional because "[t]he Constitution simply does not give Congress the authority to require the States to regulate," and this is true "whether Congress directly commands a State to regulate or indirectly coerces a State to adopt a federal regulatory system as its own."  *Id.* at 578 (internal marks omitted).

Both *Agency for International Development* and *NFIB* demonstrate that the Court will apply the unconstitutional conditions doctrine just as readily in Spending Clause cases as it does elsewhere.  These opinions, along with the rest of the Court's unconstitutional conditions *oeuvre*, control the disposition of this case and require reversal of the district court.

## II.   THE PROGRAM'S UNCONSTITUTIONAL CONDITION

The district court didn't perform an unconstitutional conditions analysis because it believed that when the desideratum is a voluntary action, such as selling products into the Medicare market, there can be no violation of a constitutional right.   But that logic just betrays a fundamental misunderstanding of how unconstitutional conditions work.  The government uses conditions to prevent the targets' access to their desiderata unless they agree to forfeit the constitutional rights impeding the objective.  So, a target's decision to pursue the desideratum *must* be voluntary, as well as highly valued.  If it were otherwise, the government would have no leverage with which to prize out a target's agreement to forfeit its constitutional right.

Mapping the elements of the unconstitutional conditions doctrine onto this case is not particularly difficult.  Congress was explicit about its objective:  Empower HHS, on behalf of patients covered by Medicare, to obtain the Selected Drugs without paying their market value.[8]  But because the manufacturers' desideratum is to sell their products at

---

[8] "The Court has repeatedly held that just compensation normally is to be measured by 'the market value of the property at the time of the taking.'"  *Horne*, 576 U.S. at 368–69.

21

market value to all who would purchase them, Congress knows they wouldn't willingly submit to the objective. Nor can Congress make it a direct mandate without violating the Fifth Amendment. So, the IRA imposes a condition on the manufacturers: Accept less than market value for the Selected Drugs, or either (a) cease selling any drug covered by Medicare, or (b) suffer the destruction of the Selected Drugs' entire economic value (and maybe the value of the rest of the business, too). This is a type of "negotiation" with which mob enforcers are very familiar.

Nonetheless, both HHS and the district court misunderstood the significance of the condition's coercive purpose and effect in obtaining the manufacturers' so-called agreement to the "negotiated" price, as well as its confiscation of the manufacturers' property. The interaction between the two represents a particularly sophisticated attempt to subvert the Takings Clause. It is no less unconstitutional for that, but it does make a deeper analysis of the interaction necessary.

### A.    The Condition

The Program's condition is a decision taken by Congress in its governmental persona, the purpose of which is to coerce manufacturers into (1) "negotiating" a below-market sale price for Selected Drugs; and

(2) actually accepting the coercively obtained price.  It operates by either forcing the manufacturer entirely out of the Medicare market (26 U.S.C. § 5000D(c)), or by imposing crippling excise taxes and penalties for the failure to "negotiate" or honor a below-market price for the Selected Drugs.  This ploy, using taxes and penalties to interpose the government between the target and its desideratum, is just as effective as an outright ban on the desideratum because, as the Court says, "[t]he power to tax the exercise of a privilege is the power to control or suppress its enjoyment."  *Murdock*, 319 U.S. at 112.  So, when such a condition penalizes the target for insisting on its rights, it is constitutionally impermissible.  *Harman*, 380 U.S. at 540 ("It has long been established that a State may not impose a penalty upon those who exercise a right guaranteed by the Constitution.").

### 1.    Failure to Negotiate

If the manufacturer refuses to enter into an Agreement to negotiate, the IRA punishes it by imposing an excise tax on the sale of Selected Drugs that can be as high as *19 times* the amount of the sale price.  26 U.S.C. § 5000D.  The point of the tax is to be so onerous that it would be less economically disastrous for the manufacturers to allow

Congress to use its property, without just compensation, to benefit its chosen designees—in this case, Medicare customers. To enhance the tax's punitive effect even further, Congress applied it not just to the Selected Drugs purchased by Medicare customers, but to *all* sales of Selected Drugs without regard to the consumer's insurance status. *Id.* Such a tax obviously destroys the economic value of the Selected Drug by appropriating its entire income stream. But that entire income stream satisfies just 1/19 of the total tax burden. The manufacturer still owes an additional *18 times* the income of the Selected Drug to retire its tax liability. Those funds, obviously, would have to come from profits derived from the sale of products that have nothing to do with the Program.

HHS asserted a different view of the math (as if one may have different views of math) in the district court, claiming that "the maximum ratio of the tax to the total amount the manufacturer charges for a drug is 95% (not 1900%, as Plaintiffs claim)." Defs.' Mem. of Law, ECF No. 38 at 8. So, HHS says, "$95 out of a $100 total amount charged for a drug by the manufacturer would go to the tax (leaving the designated price of the drug at $5)." *Id.* at 8 n.1. HHS is incorrect on two counts.

24

First, contrary to the statutory equation for calculating the excise tax, HHS presents it as nothing but a simple sales tax that tops out at 95%. Thus, if "x" equals the amount of the tax and "y" equals the sales price, HHS's understanding of the equation is x=.95(y). But the statute says the equation is .95=x/(x + y), and it says it so explicitly that it is not open to debate. 26 U.S.C. § 5000D(a). Those are not the same equations, and they most definitely do not result in the same tax liability. In HHS's example of a $100 sale, solving for "x" says the excise tax required by the statutory equation is a whopping $1,900, not $95.

That matters because of HHS's second error, in which it suggested the manufacturer may pass the excise tax along to the wholesaler and, presumably, the consumer and his health insurance plan (whether Medicare or private). It cannot. HHS's illustration of the tax, as quoted above, has the manufacturer including the excise tax in "the total amount the manufacturer charges for a drug." Defs.' Mem. of Law, ECF No. 38 at 8. But, according to the caption of § 11003 of the IRA, this is an "Excise Tax Imposed On Drug Manufacturers During Noncompliance Periods," not on wholesalers, other links in the supply chain, or the ultimate customers. Additionally, the IRA explicitly makes the tax nondeductible,

which would be superfluous if the manufacturer could simply pass the liability down through the supply chain. Inflation Reduction Act, Pub. L. No. 117-169, § 11003(b), 136 Stat. 1818, 1862 (2022).

Perhaps HHS offered its alternative view because this type of zealously draconian punishment is a bad look for Congress. But the text does exactly what Congress so clearly intended to do—flex its matchless power by imposing on manufacturers (not others in the supply chain) a punishment so stunning and intolerable that they will succumb to a "negotiated" deprivation of their constitutional rights. And so, by making it unthinkable for the manufacturers to suffer its application, the condition does exactly what it is supposed to do.

### 2. Failure to Sell at the "Negotiated" Price

If the manufacturer *does* enter into an Agreement and negotiates a "maximum fair price" for the Selected Drugs, but fails to honor it, the consequences are different, but equally devastating. The parties appear to agree that 42 U.S.C. § 1320f-6 imposes a penalty in an amount equal to 10 times the difference between the "negotiated" price and the actual price for the Selected Drugs. 42 U.S.C. § 1320f-6(a). Consequently, the price received by the manufacturer, net of the penalty, is even less than

the "negotiated" price, which was already below market value. This aspect of the condition also serves its purpose with ruthless efficiency. In a choice between accepting a below-market price and accepting a price that is even further below market (by operation of the penalty), the only rational decision is the former.

* * *

In sum, the condition puts the manufacturers to this Hobson's choice: Relinquish your constitutionally-protected right to receive just compensation for your property, or choose between (a) exiting the Medicare market entirely, and (b) shouldering taxes or penalties so ruinous they will destroy the economic value of the Selected Drugs (as well as products that have nothing to do with the Program). This extorted "agreement" to sell the Selected Drugs at below-market prices is an unconstitutional racket indistinguishable from how the mob extorts protection money—by making the alternative unthinkable.

## B.    The Constitutional Right

In the Fifth Amendment's list of limitations on government power, the Takings Clause says "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. This protection

applies to the manufacturers' interest in the Selected Drugs as much as it does to any other form of property.[9]  Whether the government keeps the property for its own use or transfers it to its chosen designee makes no difference to the "takings" analysis.  *See, e.g., Kelo v. City of New London*, 545 U.S. 469 (2005); *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 322 (2002) (collecting cases).

The question, therefore, is the same here as it was in *Horne*: "Whether a governmental mandate to relinquish specific, identifiable property as a 'condition' on permission to engage in commerce effects a per se taking." *Horne*, 576 U.S. at 364–65.  The "permission" in this case is the ability to engage in commerce without suffering ruinous taxes and penalties.  So, the only open question here is whether the Program requires manufacturers to "relinquish specific, identifiable property."  As in *Horne*, the answer is "yes."

---

[9] The *Horne* Court said "[t]he first question presented asks 'Whether the government's 'categorical duty' under the Fifth Amendment to pay just compensation when it 'physically takes possession of an interest in property' applies only to real property and not to personal property.' The answer is no." *Horne*, 576 U.S. at 357 (citations omitted).  "The Government has a categorical duty to pay just compensation when it takes your car, just as when it takes your home." *Id*. at 358.

28

The district court, however, saw "no physical appropriation taking place,"[10] which it appears to believe doesn't occur unless a government-contracted truck pulls away from the manufacturer's dock with a load of Selected Drugs—as if the existence of a "taking" turns on who does the shipping.  Of *course* there is a physical appropriation taking place.  How else could the Selected Drugs—physical, tangible, personal property—involuntarily wind up in the possession of Congress' intended beneficiaries by operation of federal law?  Some parts of the mechanism by which this occurs are not altogether clear, but the parts that *are* clear make the Program irretrievably unconstitutional.

The Program commandeers the manufacturers' property for the benefit of Congressional designees without payment of just compensation.  That much is certain.  What is less clear is how, as a practical matter, the various parties are supposed to handle the quotidian transactions that will move the Selected Drugs through the supply chain en route to the consumer at HHS-mandated prices.

---

[10] *Bristol Myers Squibb Co. v. Becerra*, 2024 WL 1855054, slip op. at 10.

Congress apparently intends HHS to finish its legislative project, because it didn't say anything on this topic.

HHS could choose between two potential methods of structuring the transactions, neither of which would solve the Program's constitutional infirmity. One would operate prospectively from the front end of the supply chain, whereas the alternative would operate retroactively from the back end. The first option would be recognizable to the district court (and, presumably, the government): HHS could order the manufacturers to load government-contracted semis full of Selected Drugs, for which it would pay the compulsively "negotiated" below-market price. This approach would be indistinguishable from the raisin set-aside program at issue in *Horne*, and would be unconstitutional for the same reason.

HHS appears to favor the alternative approach, which maintains the only two substantive elements relevant to a takings analysis: (1) it still transfers physical possession of the Selected Drugs to the Program's beneficiaries; and (2) it still compels manufacturers to accept less than just compensation for their property. The distinctive feature of this alternative is that HHS would manipulate already-completed

transactions to give Medicare customers "access" to the coercively negotiated price. Here's how it would work.

The supply chain between manufacturers and the consumer will always involve at least one intermediary; how many is not important, so let's say the manufacturer sells to a wholesaler, who then sells to the pharmacy. At the point of sale to the wholesaler, neither the manufacturer nor HHS can know how many of the pills will ultimately be purchased by Medicare customers (as opposed to private-plan customers, or customers with no plan at all). So, the manufacturer must set a single price for the entire sale, which will be passed through the supply chain to the consumer and, if applicable, Medicare or its private insurance plan.

Under this approach, HHS lies in wait until the manufacturer transfers possession of the Selected Drugs to the wholesaler. At some point between that event and the Medicare customer's purchase of his prescription, HHS would need to step in to restructure the already-completed transactions to bring the purchase price down to the "negotiated" price. That restructuring would then need to work its way back up the supply chain through a rebate or some other mechanism by

which the manufacturer would have to divest some part of the sale price. This is the approach the Centers for Medicare & Medicaid Services (one of the parties to this case) favors. In its draft guidance explaining the Program, it said a manufacturer "may meet its statutory obligation … to make the MFP [maximum fair price] available to dispensing entities by retrospectively providing reimbursement for the difference between the dispensing entity's acquisition cost and the MFP … ." Dep't of Health and Hum. Servs., Ctrs. for Medicare & Medicaid Servs., *Draft Guidance on the Medicare Drug Price Negotiation Program* at 50 (May 3, 2024).

This approach predictably (and intentionally) results in a taking: The manufacturer would be unable to refuse the sale (because the property would already be in the consumer's possession), and the condition's penalties would compel him to forfeit enough of the sale price to drive it down to the "negotiated" below-market price. The net effect of the restructuring is to retroactively create a transaction in which the manufacturer did not voluntarily engage. Such a transaction violates the "right to exclude"—that is, the right to hold one's property against all the world, which "is universally held to be a fundamental element of the property right, and is one of the most essential sticks in the bundle of

rights that are commonly characterized as property." *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 150 (2021) (cleaned up). *Et voila*, the Program has effected an involuntary transfer of private physical property to the government's chosen beneficiaries without payment of just compensation.

## C.   The Spending Clause

The Spending Clause does not excuse the Program's unconstitutional condition.  Yes, Congress may create "conditions that define the limits of the government spending program." *Agency for Int'l Dev.*, 570 U.S. at 214.  In this case, that might involve capping the amount HHS may spend on the Selected Drugs.  But the condition goes far, far beyond that limited category.  It is designed and intended to extort manufacturers into giving up their constitutional rights.  In the Court's language, the condition belongs to that category of "conditions that seek to leverage funding to regulate" constitutional rights that are "outside the contours of the program itself."  *Id.* at 214–15.  It is a transparent and ham-fisted attempt to subvert what the Constitution protects.  Surely, constitutional rights can't be juked *that* easily.

33

# CONCLUSION

For all these reasons, the district court must be reversed and the condition declared unconstitutional.

Respectfully submitted,

/s/ Andrew J. Morris
Andrew J. Morris
    *Counsel of Record*
NEW CIVIL LIBERTIES ALLIANCE
1225 19th St. NW, Suite 450
Washington, DC 20036
(202) 869-5210
andrew.morris@ncla.legal

Dated: July 19, 2024

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, TYPE-STYLE REQUIREMENTS, IDENTITY OF DOCUMENTS, AND VIRUS TESTING**

1.  This document complies with the word limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

    **X**  this document contains 6,499 words, **or**

    ☐  this brief uses a monospaced typeface and contains [*state the number of*] lines of text.

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

    **X**  this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Century Schoolbook 14-point font, a proportionally spaced typeface, **or**

    ☐  this document has been prepared in a monospaced typeface using [*state name and version of word-processing program*] with [*state number of characters per inch and name of type style*].

3.  The text of the electronic brief is identical to the text in the paper copies.

4.  A virus detection program has been run on the electronic file containing this brief and no virus was detected.  The virus detection program used was SentinelOne, version 22.3.5.887.

                             /s/ Andrew J. Morris

                              Andrew J. Morris

                              Attorney for New Civil Liberties Alliance

                              Dated: July 19, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on July 19, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which sent notification of such filing to all counsel of record.  Upon information and belief, all counsel of record are Filing Users within the meaning of L.A.R. 113.4, and are served electronically by the Notice of Docket Activity.

/s/ Andrew J. Morris
Andrew J. Morris